YORK STREET FLAX SPINNING CO. (UNITED STATES v.). See Case No. 16,-781.

YOST (LLOYD v.). See Case No. 8,437.

---

## Case No. 18,145.

### Ex parte YOUNG.

[6 Biss. 53.] [1]

District Court, N. D. Illinois. April, 1874.

WAGER CONTRACTS — "PUTS" — SETTLING DIFFERENCES—INADEQUACY OF CONSIDERATION—CLAIMS AGAINST BANKRUPT'S ESTATE.

1. "Puts," or the privilege for a nominal consideration of delivering a large quantity of grain within a certain time at a specified price, when taken of parties notoriously running a "corner," are wager contracts, and void as against public policy.

[Cited in Wolford v. Powers, 85 Ind. 304.]

2. Where no delivery of the grain was contemplated by the parties, but they expected simply to settle the differences as established by future prices, the contract is simply a wager, and therefore void.

[Cited in Clarke v. Foss. Case No. 2,852; Gilbert v. Gauger, Id. 5,412.]

3. These "puts" are also within the Illinois statute concerning gaming, and the English decisions under 8 and 9 Vict. are applicable as authorities.

4. Claims against an estate for $400,000, founded on a consideration of less than $19,000,

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

are grossly inequitable and unjust, and should not be allowed.

5. The "put" cannot be sustained, as being a measure of insuring prices, when such is not shown to have been the intent of the parties.

6. Money actually paid on these "puts" may be proved as claims against the estate.

These questions come up on motion by Sidney A. Kent, the assignee of Peyton R. Chandler, and Chandler, Pomeroy & Co., to expunge the claims of Wm. Young & Co., Bensley & Wagner, and a large number of others of the same character, on what are called "puts." These claims, having been first allowed pro forma by the register, were referred to him by the court for re-examination under the 34th general order, and the evidence was by him reported to the court. The facts fully appear in the opinion of the court.

Dent & Black, for Wm. Young & Co., claimants.

(1) It was not necessary that Wm. Young & Co. should have any of the property on hand when they entered into or took these contracts. Benj. Sales (2d London Ed.) 66; Chit. Cont. (10th Am. Ed.) 442; Hibblewhite v. M'Morine, 5 Mees. & W. 462; Wells v. Porter, 2 Bing. N. C. 722; Porter v. Viets [Case No. 11,291].

(2) Nor does the fact that it was optional with Wm. Young & Co. to deliver, render the contracts less binding. 2 Pars. Cont. (5th Ed.) 657. The doctrine there laid down, being that "an agreement may be altogether optional with one party, and yet binding on the other."

(3) As a mere offer from Chandler to Wm. Young & Co., these contracts gave a right to the latter to deliver; and this offer not being withdrawn, it continued up to and at the time of the tender. Boston & M. R. R. v. Bartlett, 3 Cush. 224; Western R. Co. v. Babcock, 6 Metc. (Mass.) 346; 1 Pars. Cont. (5th Ed.) 436, 480–482. Consult, also, Harlan v. Harlan, 20 Pa. St. 303, 307.

(4) This view also disposes of the objection alleging a want of mutuality. A contract, according to the opinion of Tindal, C. J., in Arnold v. Mayor of Poole, 4 Man. & G. 896, cannot be said to be void on that ground, except "where the want of mutuality would leave one party without a valid or available consideration for his promise." L'Amoreux v. Gould, 7 N. Y. 349; Chit. Cont. (10th Am. Ed.) 13; Morse v. Bellows, 7 N. H. 549. The law on the subject of wagers, so far as any question arises in regard to it here, is fully laid down in Fleming v. Foy [Case No. 4,862]; Beadles v. Bless, 27 Ill. 320; Bryan v. Dyer, 28 Ill. 188. Consult, also, Wells v. Porter, 2 Bing. N. C. 722, 29 E. C. L. 733; Alsop v. Commercial Ins. Co. [Case No. 262].

(5) A court should not be quick to set aside a contract on account of any supposed public policy, as clearly the legislature is the forum before which such matters most appropriate-ly come in the first instance. The observations of Best, C. J., in Richardson v. Mellish, 2 Bing. 229, are pertinent to the point in hand.

(6) And again, the inquiry as to what was a violation of public policy, and who was the violator, must be made.

(7) But, even if it had to be conceded that the claimants knew that Mr. Chandler's action was wild, so far as his general operations in the oat market were concerned, and would cause irregularities of trade, still the law would not refuse its aid to those who did not instigate or participate in such action. In Tracy v. Talmage, 14 N. Y. 162, a case of great importance, and maturely considered, the court of appeals held that "mere knowledge by the vendor that the purchaser intends to make an illegal use of the property, is not a defense to an action for its price." Consult, also, Hill v. Spear, 50 N. H. 253; Michael v. Bacon, 49 Mo. 474.

Goudy & Chandler, and James E. Monroe, for Bensley & Wagner, claimants.

The contract is valid on its face, and it is not unilateral, nor void for want of mutuality. In the following cases contracts have been challenged for want of mutuality have been enforced: In re Hunter, 1 Edw. Ch. 1; Bing. Real Prop. 400; Eno v. Woodworth, 4 N. Y. 249; Page v. Hughes, 2 B. Mon. 439; Mason v. Payne, 47 Mo. 517; Fry, Spec. Perf. 291; Towers v. Barrett, 1 Term R. 133; Story, Sales, §§ 247, 248, 417; Metc. Cont. 21; Newbery v. Armstrong, 4 Car. & P. 59; Paige v. Parker, 8 Gray, 213; Morton v. Burn, 7 Adol. & E. 23; Kennaway v. Treleavan, 5 Mees. & W. 498; Giles v. Bradley, 2 Johns. Cas. 252; Disborough v. Neilson, 3 Johns. Cas. 81; Cherry v. Smith, 3 Humph. 19. There is no statute prohibiting such a contract, nor is it void by any rule of the common law. That it should not be considered under any claim or consideration of public policy, consult License Tax Cases, 5 Wall. [72 U. S.] 462, 469; Brown v. Speyers, 20 Grat. 296; 1 Story, Cont. §§ 546, 547, 566; Good v. Elliott, 3 Term. R. 698; Porter v. Viets [Case No. 11,-291]; Tyler v. Barrows, 6 Rob. (N. Y.) 104; Hibblewhite v. M'Morine, 5 Mees. & W. 462, overruling, Bryan v. Lewis, Ryan & M. 386. A wager is not illegal at common law. Morgan v. Pebrer, 4 Scott, 230; Good v. Elliott, 3 Term R. 693; Wells v. Porter, 2 Bing. 722, 732; Mortimer v. M'Callan, 6 Mees. & W. 58; Morgan v. Richards, 1 Brown (Pa.) 171; Campbell v. Richardson, 10 Johns. 406; Morgan v. Pettit, 3 Scam. 529; Smith v. Smith, 21 Ill. 244; Beadles v. Bless, 27 Ill. 320.

Harding, McCoy & Pratt, for assignee.

These "puts" should not be enforced, as inequitable and unconscionable. James v. Morgan. 1 Lev. 111; Thornborow v. Whitaker, 2 Ld. Raym. 1164; Gwynne v. Heaton, 1 Brown, Ch. 9; Howard v. Edgell, 17 Vt. 27; Savile v. Savile, 1 P. Wms. 745; Fry, Spec. Perf. §§ 177, 277, 279, and notes; Os-

good v. Franklin, 2 Johns. Ch. 24; Johnson v. Dorsey, 7 Gill, 294; Cockell v. Taylor, 15 Beav. 115; Seymour v. Delancey, 3 Cow. 445; Hamilton v. Grant, 3 Dow, 33–47; Kimberley v. Jennings, 6 Sim. 340. This contract is void for want of mutuality. Baxter v. Lamont, 60 Ill. 237. The letter of the contract does not necessarily prevail, but it may be shown by parol to be void. Paxton v. Popham, 9 East, 408; Chandler v. Ford, 3 Adol. & E. 651; Mitchel v. Reynolds, 1 P. Wms. 196; Grizewood v. Blane, 11 C. B. 538; Brua's Appeal, 55 Pa. St. 294; Kirkpatrick v. Bonsall, 72 Pa. St. 155; Tyler v. Barrows, 6 Rob. (N. Y.) 104; Cassard v. Hinman, 1 Bosw. 207. The contract is void on the ground of public policy. Mount v. Waite, 7 Johns. 434; Edgell v. McLaughlin, 6 Whart. 175; Ball v. Gilbert, 12 Metc. (Mass.) 397; Marshall v. Baltimore & O. R. Co., 16 How. [57 U. S.] 333–336; Stanton v. Allen, 5 Denio, 434; Neustadt v. Hall, 58 Ill. 175. These "puts" are also void as contrary to public policy and public interest. Morgan v. Pettit, 3 Scam. 529; Beadles v. Bless, 27 Ill. 320; Gregory v. King, 58 Ill. 169; Edgell v. McLaughlin, 6 Whart. 175; Ball v. Gilbert, 12 Metc. (Mass.) 399; Egerton v. Earl Brownlow, 4 H. L. Cas. 143; Stanton v. Allen, 5 Denio, 441; Neustadt v. Hall, 58 Ill. 175. This contract was really an agreement to "settle the differences," a bet upon the price; and such contracts are void. Rourke v. Short, 5 El. & Bl. 904; Shumate v. Com., 15 Grat. 653. Where advantage is taken of the ignorance or distress, or necessity of another, it affords a new and distinct ground for setting aside a contract, and either of these circumstances existing, in connection with gross inadequacy is enough to warrant a court in so doing. Osgood v. Franklin, 2 Johns. Ch. 24; Johnson v. Dorsey, 7 Gill, 269–294; Cockell v. Taylor, 15 Beav. 115; Seymour v. Delancey, 3 Cow. 445; Fry, Spec. Perf. § 277, note 1, and cases cited; Hamilton v. Grant, 3 Dow, 33–47; Kimberley v. Jennings, 6 Sim. 341. The contract is void for want of mutuality. Pothier, pt. 1, c. 1, art. 3, § 7; Fry, Spec. Perf. § 286, note, and cases cited; Baxter v. Lamont, 60 Ill. 237. This is a wagering contract, contrary to public policy and public interest, and therefore cannot be enforced. Sampson v. Shaw, 101 Mass. 145; Hilton v. Eckersley, 6 El. & Bl. 47; Paxton v. Popham, 9 East, 201; Collins v. Blantern, 2 Wils. 347; Chandler & Ford, 3 Adol. & E. 649; Mitchel v. Reynolds, 1 P. Wms. 196; Grizewood v. Blane, 11 C. B. 538; Brua's Appeal, 55 Pa. St. 298; Kirkpatrick v. Bonsall, 72 Pa. St. 155; Ex parte Marnham, 2 De Gex, F. & J. 634; Tyler v. Barrows, 6 Rob. (N. Y.) 104; Cassard v. Hinman, 1 Bosw. 207. The case of Porter v. Viets [supra] relates to a contract, not to a "put." These "puts" are void, as being within the first section of the statute of this state concerning gaming. 1 Gross, 312. "All promises, agreements, etc., made, etc., where the whole or any part of the consideration there-

of, shall be for any money, property, or other valuable thing, won by any gaming, or playing at cards, etc., or by betting on the side or hands of any person gaming, etc., shall be void." The spirit in which the supreme court of Illinois regards this species of contract appears in 59 Ill. 160. Another view may be taken of the case—the "put" is simply an agreement to "pay differences"—a bet upon the price. Consult Rourke v. Short, 5 El. & Bl. 904; Shumate v. Com., 15 Grat. 653.

Walker, Dexter & Smith, also for assignee.

BLODGETT, District Judge. It appears from the testimony submitted with the register's report that in the month of May, 1872, and for several years prior thereto, the bankrupts, Peyton R. Chandler, and the firm of Chandler, Pomeroy & Co., were engaged in the business of buying and selling grain on the Chicago market, and as members of the board of trade of this city; that Chandler, Pomeroy & Co. were brokers and commission merchants, and Peyton R. Chandler dealt mainly on his own account as a capitalist, through Chandler, Pomeroy & Co., who acted as his brokers; that about the middle of May, Peyton R. Chandler conceived the idea of making a corner in oats for the month of June then ensuing, and with that view he purchased all the "cash oats" as they arrived in the market, and took all the "options" offered him for June delivery,—his purpose being to own all the oats in the market, and compel those who had sold "options" for June to pay his price; or, in other words, to settle with him by paying such differences as should exist between the prices at which he purchased the options, and the price he should establish for cash oats on the last day of June, when his options matured. In pursuance of this plan, he purchased, between the 15th of May and the 18th of June, 2,500,000 bushels of cash oats, being all, or substantially all, the cash oats on the market, and also bought June "options" to the amount of 2,939,400 bushels. The total amount of oats in store in this city on the 18th of June was only 2,700,000 bushels, from which it will be seen that Chandler practically controlled the market up to that time, and the total amount received during the remainder of the month was only 800,000 bushels. As incidental to and part of the machinery of this corner, Chandler also sold what are called "puts," or privileges of delivering to him oats during the month of June, for forty-one cents a bushel. These "put" contracts are alike in form, and read as follows: "Received of E. F. $50, in consideration of which we give him, or the holder of this contract, the privilege of delivering to us or not, prior to 3 o'clock p. m., of June 30, 1872, by notification or delivery, 10,000 bushels No. 2 oats, regular receipts, at 41 cents per bushel, in store; and, if delivered, we agree to receive and pay for the

same at the above price. Chandler, Pomeroy & Co. P. R. Chandler. Chicago, June ——, 1872."

The amount paid by the purchaser of these "puts" was ½ cent per bushel for whatever quantity was named in the contracts. The tickets, or contracts, were all signed by Chandler, Pomeroy & Co., and part of them were also signed by P. R. Chandler, but Chandler, Pomeroy & Co. acted as the brokers of P. R. Chandler, and their contract was his. The total quantity of oats called for by these "puts" amounted to about 3,700,000 bushels. When Chandler commenced to buy oats with a view to the corner, the price in this market was about thirty-nine cents a bushel. After he took possession of the market he put the price to forty-one cents and upward, and held it there until the 18th of June. In the meantime the price had declined in New York and other markets, so that oats to ship were not worth over thirty-three to thirty-five cents, and July options for this market were not worth over thirty-five cents. On the 18th of June P. R. Chandler and Chandler, Pomeroy & Co. failed, and the price declined before the close of business that day from forty-one to thirty cents, and continued to decline during the remainder of the month, so that at one time they were as low as twenty-six cents per bushel. Between the time of the failure and 3 o'clock on the 30th of June, the holders of the "puts" claim to have made tender to the bankrupts of the quantity of oats called for by their respective tickets, and the oats not being accepted and paid for, they sold them upon the market that day or the next, under the rules of the board of trade, and have proved up their claims for the differences between the price named in the "put" and that for which they sold. The total amount of claims thus proved up is about $400,000, and the total amount received by the bankrupts for these "puts" was less than $19,000,—about $18,500, as I compute it at half a cent a bushel.

The proof shows conclusively that the plans of Chandler, and the fact that he was manipulating the market with express reference to a corner in oats for June, were well known and understood on the board of trade, while the number of these "put" claims, about 125, all, or substantially all, in favor of members of the board, show that the struggle between Chandler, who was endeavoring to hold up prices, and the sellers of "options" and holders of "puts" who were endeavoring to break the price, was quite generally participated in by members of the board. In other words, it was notorious that Chandler was endeavoring to keep the price at forty-one cents or upwards, while the sellers of "options" and holders of "puts" were endeavoring to break down the price. It is true that in this testimony some of the claimants say there was no "corner," or that they did not know that there was a corner, but the cross-examination shows that they knew Chandler was trying to make a corner, and they say he did not do it because he failed before the end of the month, so that by their own admission, they knew what he was attempting—knew the reasons for his purchase of such large quantities of "cash oats" and options, and knew he did not sustain his corner because the "short interest broke him down," and the moment a man bought a "put," he became identified with the short interest—his interests were antagonistic to Chandler.

The assignee attacks these claims upon the ground that they are fraudulent as against the other creditors of the bankrupt. The main ground, and the only one which I shall consider, being that they are wager-contracts, and therefore void. Without taking time to discuss all the points raised by the able arguments which have been adduced, and the various reasons urged for and against these claims, it is enough to say that it seems to me that the contracts in question partake of all the characteristics of a wager. It is in substance an assertion by the seller of the "put" that oats cannot be purchased on that market before three o'clock p. m. of the 30th of June for less that forty-one cents a bushel, and an undertaking to pay the difference between forty-one cents and any market price. If he, Chandler, sustains the price at forty-one cents or above, he wins the half-cent a bushel paid for the "put," because the holder will not deliver, while if the price goes below that named he is to pay the difference. This is practically the contract. It is as manifestly a bet upon the future price of the grain in question, as any which could be made upon the speed of a horse or the turn of a card. The evidence in this case shows that in nearly all the cases of settlements on "put" or "option" contracts the grain is never delivered, nor expected to be delivered, but the parties simply pay the difference as settled by the prices. But, if that were not so in all cases, it is clear that in this case no delivery of the grain was intended by these "put" holders, because they knew that Chandler controlled all the oats in the market and fixed the price, and that their only expectation for success depended on their being able to break the market before their time for delivery expired. Some of them say that they intended to deliver the oats, but it is absurd to suppose that they intended to deliver, unless they could do so for less than forty-one cents. They intended to deliver if they could break Chandler, or prevent his "corner" from culminating, as the jockey may intend to walk his own horse over the course after he has poisoned or lamed that of his competitor. They did not intend to deliver if Chandler succeeded. Thus a struggle inevitably ensued between Chandler and the holders of this immense amount of "puts" and "options," Chandler alone on one side attempting to

hold up the price, and all the rest seeking to put it down. The fact that the sellers of "options" and holders of "puts" were able to get resolutions through the board of trade, making new warehouses, where oats had never been stored before, "regular" for the performance of these contracts, shows the intensity of the contest and the overwhelming influences with which Chandler had to contend. I do not mean to be understood as saying that the fact that Chandler sold "puts" to so many as to create an overwhelming opposition, makes the transaction any more or less a wager than if he had only sold one "put," but it shows the notoriety of the whole proceedings.

From the very nature of the transaction the interest of the holder of the "put," is to break down the price, and that of the seller to maintain it. The number engaged in this transaction, and the quantities involved, demonstrate that neither party expected any grain to be delivered. Chandler expected to hold up the price, in which event no grain would be offered him, and the other parties must have known they could not get the grain to deliver unless they first broke Chandler, as he held all the grain, and then, although they might tender, he could not receive, so that in reality no actual delivery was anticipated. They made their tenders only as a method of establishing differences after he had failed, and was powerless.

That transactions of this kind are only wagers, is abundantly established by authorities.[2] It is true those cases arose under statutes making such transactions void as gaming contracts. But the test applied was: did the parties intend to sell on one side and buy on the other the stocks which purported to be the subject-matter of the transaction, or did they only intend to adjust the differences? And as it was found that they only meant differences when they said shares, the contracts were held to be essentially gambling contracts, and therefore void.

It is said, however, that there is no statute in this state expressly prohibiting contracts of this kind, as there is in England and Pennsylvania; and, as the supreme court of this state has decided that wagers are not necessarily void, therefore, these contracts— not being inhibited by any express law of this state—are not void. There is no dispute that contracts of wager are valid at common law, unless affected with some special cause of invalidity. Ball v. Gilbert, 12 Metc. (Mass.) 397. But wagers which are contrary to public policy have always been held by the courts to be essentially void, without statutory prohibition, and cannot be made the ground of an action. Hartley v. Rice, 10 East, 22. And a high authority in the pro-

fession has stated the law on the subject of the validity of wagers with great force and clearness, when he says: "As the moral sense of the present day regards all gaming or wagering contracts as inconsistent with the interests of the community, and at variance with the laws of morality, the exception necessarily becomes the rule." 2 Smith, Lead. Cas. 306. Indeed, any one rising from a full examination of the law applicable to wagers, as expounded by the courts, would undoubtedly testify that, while he has found in the books, and especially among the older text-writers and cases, general expressions to the effect that wagers were valid at common-law, he has found the cases where they have been enforced to be extremely rare, and the courts have been astute to find reasons for not enforcing them.

Following this general current of authority, the supreme court of this state, under the statute prohibiting gaming, has decided that the wagers upon horse-races are void, and cannot be enforced; and that money paid on such wagers can be recovered back. Tatman v. Strader, 23 Ill. 493; Garrison v. McGregor, 51 Ill. 473. The language of the Illinois statute on which these decisions are based, is, in substance, that all promises made, etc., where the consideration, or any part thereof, shall be money won by gaming, etc, shall be void. The language of 8 and 9 Vict., on which Grizewood v. Blane and other English cases were decided, is: "All contracts or agreements, whether by parol or in writing, by way of gaming or wagering, shall be null and void." The precise question made in this case has never been before the supreme court of this state to my knowledge, and I am not aware that it has ever been raised at the circuit, except in a late case before his honor Judge Tree, of this city, when he held that "option contracts for grain, when the parties intended only to pay the differences, and not to deliver the grain, were void, as wagering contracts." But it hardly seems possible that any court called upon to construe the Illinois statute in the light of the expositions already made by our courts, and of the English decisions upon a statute so substantially similar, could hesitate to pronounce these contracts wagers, and void as contrary to the statute.

But even if not within the letter or spirit of the statute of this state, the common-law authorities quoted show that all wagers contrary to the public policy are void without reference to any statute. And, as the contracts under consideration are essentially nothing but bets upon the price of oats in this market within the time limited, and as it is obvious that the effect of such transactions is to beget wild speculations, to derange prices, to make prices artificially high or low, as the interests, strength and skill of the manipulators shall dictate, thereby tending to destroy healthy business and un-

---

2 Grizewood v. Blane, 11 C. B. 538; Brua's Appeal, 55 Pa. St. 298; Kirkpatrick v. Bonsall, 72 Pa. St. 155; Ex parte Marnham, 2 De Gex, F. & J. 634; Cassard v. Hinman, 1 Bosw. 207.

settle legitimate commerce, there can be no doubt of the injurious tendency of such contracts, and that they should be held void as against public policy. As is most cogently said by the learned judge who delivered the opinion in the case cited from 55 Pennsylvania State Reports: "Anything which induces men to risk their money or property without any other hope of return than .to get for nothing any given amount from another, is gambling, and demoralizes the community, no matter by what name it may be called." The financial disaster and ruin which followed "Black Friday" in New York, and the scarcely less damaging local consequences which followed the various "corners" which have either succeeded or been attempted in this city, furnish conclusive proof, if proof were needed, that such gambling operations should be held void, as contrary to public policy.

The total amount paid by the claimants in these cases was less than $19,000, and yet the amount they claim is within a fraction of $400,000—a disparity between the consideration paid and the sum demanded which strikes the mind at once as so grossly inequitable that the judicial conscience is shocked, and revolts from being made the instrument for enforcing such outrageous injustice.

I do not intend to be understood as holding that every option contract for the delivery of grain or stock, or that every "put," is necessarily void, but only that all these contracts, in the light of the testimony before the court, were in their essential features gambling contracts. The parties when they made them did not intend to deliver the grain, but only at the utmost to settle the differences. They knew they could not obtain the grain to deliver if Chandler sustained his "corner," and their action in buying a "put" was virtually a bet on their part that he could not accomplish what they all knew he was endeavoring to do, that is, keep up the price through June to his own figures, and virtually a bet on his part that he could do so.

It is shown in the proof, and urged in the argument, that the "put" is in itself a very harmless contract—that dealers frequently resort to it as a method of insuring prices. It is answer enough to this to say that the proof fails to show that such was the object of any of these claimants. Chandler was taking all the cash oats offered at the price named in the "puts" and upward, and none, with the exception of Bensley, claim that they had any oats to fill the "puts" at the time they bought, or bought for that purpose till after Chandler's failure. It is perhaps possible to imagine a dealer with a stock of grain on hand which he wishes to hold for an advance, who may take a privilege of this kind to insure himself against a decline while waiting for an advance. But the very act of offering to sell a "put" either implies that the seller has control of the mar-

30 Fed.Cas.—53

ket so that he expects to make his own price, or else it is a mere reckless assertion of the seller's opinion that the price will be maintained, either of which partakes of the character of a bet. "A wager," says Bouvier, "is a contract by which two parties or more agree, that a certain sum of money or other thing, shall be paid or delivered to one of them on the happening or not happening of an uncertain event." To say that these contracts were taken for the purposes of insurance, is too far-fetched an excuse, and evidently an afterthought.

In what I have said I do not intend to vindicate Chandler. His conduct was as reprehensible as that of the claimants. All were engaged in an immoral and illegal transaction, and this court ought not to allow its powers to be prostituted to the enforcement of these contracts for either party. Money lost at play or in gaming cannot be recovered except where an action is given by statute, but, as I have already intimated, my opinion that these cases are within the statute of this state on the subject of gaming, under which money paid may be recovered back, I shall allow the claimants to prove their claims for the amounts actually paid by them respectively, which is a half cent per bushel on the grain named on their tickets.